# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| AMY ELIZABETH CONNOR BOWEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **Case No. 3:13-cv-0414** |
| v. ) | **Judge Aleta A. Trauger** |
| ) | |
| BRAD DOUGLAS PAISLEY, et al., ) | |
| ) | |
| Defendants, ) | |
| ) | |
| And ) | |
| ) | |
| JOHN KELLEY LOVELACE and CHARLES ) | |
| CHRISTOPHER DUBOIS, ) | |
| ) | |
| Counterclaimants, ) | |
| ) | |
| v. ) | |
| ) | |
| AMY ELIZABETH CONNOR BOWEN, ) | |
| ) | |
| Counter-Defendant, ) | |

## **MEMORANDUM**

The plaintiff has filed a motion (Docket No. 66) under Rule 12(b)(6) and Rule 12(f) that asks the court to (1) dismiss counterclaims by defendants John Kelley Lovelace and Charles Christopher DuBois, and (2) strike certain affirmative defenses asserted by all defendants. For the reasons stated herein, the motion will be granted in part and denied in part. Lovelace's and DuBois' counterclaims for indemnification will be dismissed, Lovelace's and DuBois' counterclaims for breach of contract will proceed (except to the extent they seek attorney's fees), and the court will not strike the referenced affirmative defenses.

1

**BACKGROUND**

Plaintiff Amy Elizabeth Connor Bowen ("Connor") copyrighted and recorded a song entitled "Remind Me." She claims that the defendants, including popular country music recording artists Brad Paisley and Carrie Underwood, violated her copyright interests in that song by copying certain of its key constituent elements.[1] She alleges that the defendants may have gained access to Remind Me (directly or indirectly) when she performed it during a 2008 Country Music Songwriting Workshop ("Workshop") in Nashville, at which DuBois and Lovelace, who are professional songwriters and music producers, served as guest instructors.[2]

Defendants DuBois and Lovelace allege that, as a condition of participation in that Workshop, Bowen signed a "Participant Consent Agreement" with the organizers of the event. A copy of the agreement is attached to the Answer and Counterclaims filed by Lovelace and certain other defendants. (Docket No. 63, Ex. A ("Consent Agreement").) The court takes notice of that document under Fed. R. Civ. P. 10(c). The Consent Agreement is dated April 8, 2008 and appears to bear Connor's signature.

Lovelace and DuBois allege that the Workshop's representatives informed attendees that participation in the Workshop was conditioned on signing the agreement and that attendance at the Workshop would constitute acceptance of its terms. They allege that Connor agreed to the

---

[1] In a previous opinion, the court denied the defendants' Motion to Dismiss the Amended Complaint under Rule 12(b)(6). (*See* Docket Nos. 58 and 59.)

[2] Although not addressed by the parties, the court notes that the Workshop is not the only means of "access" that Connor alleges in her Amended Complaint. She alleges that she performed Remind Me numerous times in live public performances in Nashville between 2008 and 2011, including at least six performances at the "Bluebird Café." She also alleges that she worked extensively with a local publishing company concerning the song Remind Me, and that the publishing company's "assistant song plugger" later left that company to work for defendant Lovelace's publishing company, defendant EMI April Music, Inc.

Consent Agreement (1) orally, (2) by attending the Workshop, and (3) by signing it. Notably, Connor alleges that she participated in the Workshop from February through May of 2008, and that, on March 3, 2008, she performed Remind Me for Lovelace, whom she alleges intensively critiqued the song. Therefore, it appears that she signed the Consent Agreement after she began the Workshop and after she performed Remind Me for Lovelace.

DuBois and Lovelace allege that, in the Consent Agreement, Connor effectively waived her right to bring the copyright claims asserted against them, at least as they relate to access gained through the Workshop. DuBois and Lovelace point to the following language in the Consent Agreement:

> Due to legal considerations, we require you to sign this Consent and pay the $500.00 fee prior to your participation in the Workshop.
>
> Your submission of songs (whether lyric, instrumental only or music and lyrics), or any portion thereof, for critique by Presenter or it's [sic] instructors constitutes your agreement to release, indemnify, hold harmless and covenant not to sue Presenter and any instructors, agents, employees, affiliates, representatives, assignees, successors and designees from any and all claims in connection with your participation in the Workshop, including without limitation, claims for slander, libel, defamation, invasion of privacy or right of publicity, copyright or trademark infringement or other misappropriation, or any other claims or causes of action related to or arising out of the foregoing.[3]

---

[3] The next paragraph of the Consent Agreement states that "the Workshop, while being conducted on premises owned by a Doyle Party, is not affiliated with or endorsed by any Doyle Party." The "Doyle Parties" are identified as "Major Bob Music, Inc., Bob Doyle, Bob Doyle and Associates, Inc., Major Bob Music Productions, Inc. or any other related or associated entity or individual." This paragraph continues as follows:

> Your participation in the Workshop constitutes your agreement to release, indemnify, hold harmless and covenant not to sue the Doyle Parties and their parent companies, sister companies, any and all affiliated companies [the "Releasees"] . . . from any and all claims *now or hereafter existing* in connection with your participation in the Workshop, including without limitation, slander, libel, defamation, invasion of privacy or right of publicity, copyright or trademark infringement or other misappropriation, or any other claims or causes of action

DuBois and Lovelace alleged that, as "instructors" at the Workshop, they are intended third-party beneficiaries of the Consent Agreement. Based on that understanding of the Consent Agreement, they assert counterclaims for (1) indemnification, and (2) breach of contract. Among other forms of relief, they seek to recover their attorney's fees and expenses in defending this lawsuit, contending that the Consent Agreement authorizes fee shifting. As described in the final section herein, Lovelace also seeks consequential damages stemming from the initiation of this lawsuit by Connor, allegedly in breach of the Consent Agreement. All of the defendants (not just Lovelace and DuBois) assert affirmative defenses premised on the Consent Agreement.[4]

Connor has (1) moved under Rule 12(b)(6) to dismiss the counterclaims asserted by DuBois and Lovelace (or, at least, to limit the categories of damages that they may seek to recover for breach of the Consent Agreement) and (2) moved under Rule 12(f) to strike the

---

> related to or arising out of the foregoing. You further agree to assume all the risks and responsibilities surrounding your participation in the Workshop and release, waive, forever discharge, and covenant not to sue the Releasees, from and against any and all liability . . . for any and all harm, injury (personal or otherwise), damage, claims, demands, actions, causes of action, costs, and expenses of any nature that you may have *or that hereafter accrue to you*, arising out of any loss, damage, or injury that may be sustained by you or any property belonging to you, whether caused by the negligence or carelessness of the Releasees, or otherwise, while in, on, upon or on the way to the premises where the Workshop is conducted.

(Consent Agreement (emphases added).) Here, neither party has referenced this language in their briefing, although it ultimately may have significance (perhaps by way of comparison or contrast) when construing the provisions relating to the "Presenters" in the previous paragraph of the Consent Agreement.

[4] Given that access through the Workshop is only one means of access to the work alleged in the Amended Complaint, the court assumes that the counterclaims and defenses are limited to alleged access gained through the Workshop.

defendants' affirmative defenses to the extent that they are premised on the Consent Agreement or, in the alternative, to dismiss those defenses as to all defendants other than Lovelace and DuBois.

## ANALYSIS

### I. Indemnification Claims

DuBois and Lovelace purport to seek contractual indemnification from Connor. However, under Tennessee law, a contractual duty to indemnify generally arises only with regard to claims brought by third parties against the putative indemnitee. *See Colonial Pipeline Co. v. Nashville & E. R.R. Corp.*, 253 S.W.3d 616, 624 (Tenn. Ct. App. 2007), *cert. denied* (2008) (citing *Eatherly Constr. Co. v. HTI Mem'l Hosp.*, 2005 WL 2217078, at *10-*11 (Tenn. Ct. App. Sept. 12, 2005)) (affirming trial court's holding that a promise by an indemnitor to "indemnify and save harmless [the indemnitee] from and against all claims [and] suits" applied "only to suits brought by third parties," because "application of this indemnity provision to a contract dispute between the contracting parties would yield an absurd result"); *see also Holcomb v. Cagle*, 277 S.W.3d 393, 397-98 (Tenn. Ct. App. 2008). To permit DuBois and Lovelace to receive "indemnification" from Connor would lead to the "absurd result" referenced in *Colonial Pipeline*: requiring Connor to defend DuBois and Lovelace against her own claims.[5]

---

[5] In *Eatherly*, a property owner (the defendant) entered into an agreement with a contractor, Eatherly (the plaintiff), to build a water line and pumping station for a new hospital. 2005 WL 2217078, at *1. The agreement included an indemnity clause, which provided that the contractor would indemnify the owner "from and against all claims . . . and expenses (including attorney's fees)" arising out of the contractor's breach of his obligations under the construction agreement. *Id.* at 10. In relevant part, the contractor sued the owner for refusing to adjust the contract price and for wrongfully retaining certain funds associated with the project. *Id.* at *2. The owner filed a counterclaim, alleging that the contractor had breached the agreement by failing to finish the project on time, and the owner sought to recover its attorney's fees from the contractor under the

5

The defendants' counterargument relies on *Linden v. Am. Storage Park*, 1990 WL 6836, at *5 (Tenn. Ct. App.1990), an unpublished decision in which the Tennessee Court of Appeals approved, without discussion of the "absurd result" identified in *Colonial Pipeline*, an award of attorney's fees to the indemnitee against claims by the indemnitor. To the extent that the holding in *Linden* conflicts with the logic or holdings of *Colonial Pipeline* or *Holcomb*, the court relies, as it is obligated to do, upon the (subsequent) published decisions in *Colonial Pipeline* and *Holcomb*. *See* Tenn. Sup. Ct. R. 4(G); *Fortune v. Unum Life Ins. Co.*, 360 S.W.3d 390, 398 (Tenn. Ct. App. 2010).

Accordingly, the counterclaims for indemnification will be dismissed.[6]

## II. Breach of Contract Claims

### A. The Covenant Not to Sue

The parties have engaged in a robust debate about the scope and enforceability of the terms of the Consent Agreement. Lovelace and DuBois purport to base their counterclaims upon the Consent Agreement's "covenant not to sue" – not the Consent Agreement's release – by which, they contend, Connor essentially waived the right to pursue her copyright claims against

---

indemnification clause. On appeal, the Court of Appeals affirmed the trial court's ruling that the indemnification clause did not entitle the owner to recover attorney's fees from the contractor, observing that "[a]pplying Memorial's [the owner's] rationale would produce an absurd result in litigation that is only between Eatherly and Memorial. If [the indemnity provision] applied to this litigation, Eatherly would be required to assume and conduct Memorial's defense." *Id.* It was this "absurd result" that the Tennessee Court of Appeals referenced in *Colonial Pipeline*.

[6] Even if the indemnification counterclaims were not subject to dismissal, they are essentially coextensive with the breach of contract counterclaims by DuBois and Lovelace, which will proceed. Like the breach of contract counterclaims, the indemnification claims would not have entitled DuBois and Lovelace to attorney's fees because, as discussed herein, the contract does not specifically provide for fee shifting.

6

them.  By contrast, Connor contends that the Consent Agreement only waived claims that had accrued as of the date she signed it, *not* any future claims that accrued later (including her copyright claims here).  Furthermore, in a footnote in her Reply, Connor contends that she may challenge the validity of the Consent Agreement because, among other things, it lacked consideration.

The parties' briefs raise a number of difficult issues of Tennessee contract doctrine.  Connor argues that the court should interpret the scope of the covenant not to sue as coextensive with the scope of the general "release" set forth in the Consent Agreement, which would likely be limited only to claims that existed at the time of the release.  *See Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 445-60 (6th Cir. 2011) (applying Tennessee law concerning releases); *see also Miller v. E. Tenn. Trucks, Inc.*, 754 S.W.2d 73 (Tenn. Ct. App. 1988).  As Connor points out, the doctrinal and practical distinctions between "releases" and "covenants not to sue" are largely, if not completely, obsolete in light of Tennessee's adoption of the comparative fault doctrine and its codification of the Uniform Contribution Among Tortfeasors Act ("UCATA") at Tenn. Code Ann. § 29-11-101 *et seq.*, and in particular Tenn. Code Ann. § 29-11-105(a) (§ 4 of the UCATA).

The defendants do not appear to dispute – at least for purposes of this motion – that the language in the Consent Agreement constitutes a general release that released only claims that Connor possessed when she signed the agreement.  However, the defendants argue that, because covenants not to sue are distinct from releases and may apply to future claims, the court should not reflexively apply the law concerning "general releases" to the covenant not to sue here.

The defendants cite to a United States Supreme Court case and a Southern District of New York case, each of which involved the enforcement of a covenant not to sue the defendant

for *future* copyright claims. *See Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 728 (2013); *Velvet Underground v. Andy Warhol Foundation for the Visual Arts, Inc.*, 890 F. Supp. 2d 398, 402 (S.D.N.Y. 2012).[7] Both of these cases involve distinguishable procedural postures.

*Already* involved a lawsuit between Nike and another shoe manufacturer, Already. *Id.* at 725. Nike initially sued Already for infringing Nike's trademark to a particular type of shoe. *Id.* Already counterclaimed, alleging that Nike's trademark was invalid and that Nike was seeking to interfere with Already's legitimate business activity. *Id.* Well after Nike had filed the lawsuit and Already had filed its counterclaims, Nike issued a "Covenant Not to Sue," in which it promised not to raise any unfair competition or trademark claims against Already for any of Already's existing designs and any future "colorable imitation" thereof. *Id.* Nike then moved to dismiss its own claims with prejudice and sought to dismiss Already's counterclaims without prejudice, on the grounds that Nike's covenant had extinguished the case or controversy. *Id.* Already argued that it should be able to prosecute its counterclaim that Nike's covenant was invalid, based on the possibility (which it did not adequately support) that its future shoe designs might fall outside the scope of the covenant. *Id.* 725-26. In relevant part, the Supreme Court held that Nike's sweeping covenant not to sue satisfied the "voluntary cessation" doctrine, which requires a showing that "it is absolutely clear" that the allegedly wrongful behavior (in *Already*, challenging Already's legitimate shoe sales) was unlikely to recur. *Id.* at 727-28. Therefore, the court found that the lawsuit was moot. Notably, neither party challenged the validity or enforceability of the covenant not to sue: effectively, the only issue in dispute was whether, in

---

[7] As Connor points out, none of the parties in *Already* and *Velvet Underground* had an incentive to challenge the enforceability of the agreements at issue in the first place.

light of that covenant, there was any reasonable chance that Nike would pursue Already or its customers for future sales based on existing products or any future similar product lines.

In *Velvet Underground*, the plaintiff, Velvet Underground, had used a design created by Andy Warhol on its most popular music album, which Velvet Underground continued to license and profit from long after the album had been released. *Id.* at 401-02. The Warhol Foundation, which owns copyrights in some of Warhol's works, later contested Velvet Underground's claim that it had exclusive copyright interests in the design. *Id.* at 402. Velvet Underground filed an action seeking a declaratory judgment that the Warhol Foundation did not in fact have a copyright interest in the design. *Id.* After the lawsuit was filed, the Warhol Foundation signed a broad covenant not to sue the Velvet Underground, in which the Warhol Foundation "unconditionally and permanently renounced" its right to initiate any action against the Velvet Underground relating to copyright interests in the disputed design, regardless of whether claims accrued "before, on, or after" the date of the covenant and regardless of whether the claim arose from Velvet Underground's "past, current, or future conduct." *Id.* at 402-03. In relevant part, the only issue in dispute was whether this broad covenant encompassed the Velvet Underground's declaratory judgment action: Velvet Underground argued that it might not cover Velvet Underground's licensees. *Id.* at 403. The district court held that the breadth of the covenant not to sue "facially appears to eliminate the prospect that the Warhol Foundation will assert any copyright it may have against VU or its licensees." *Id.* at 404-405. Therefore, it found that the covenant not to sue divested it of declaratory judgment jurisdiction over Velvet Underground's claim that the Warhol Foundation held no copyright in the disputed design. *Id.*

Aside from establishing that an entity can, under appropriate circumstances, covenant not to sue for intellectual property claims that accrue in the future, the circumstances in *Already* and

9

*Velvet Underground* are different procedurally and factually from those presented here. In both *Already* and *Velvet Underground*, the party covenanting not to sue apparently used the covenant not to sue as a procedural mechanism to moot a claim. The parties covenanting not to sue presumably had full knowledge (and a legitimate incentive) to issue a covenant not to sue in the context of each case. Furthermore, the covenants themselves contained sweeping language that explicitly and unequivocally covered both past and future claims. Also, in both cases, the parties did not, and had no incentive to, dispute the enforceability of the covenant not to sue at issue. None of these relevant circumstances appear to be present here.

At any rate, it appears that both sides make valid points. Under appropriate circumstances, a covenant not to sue can cover future claims. On the other hand, the defendants have not provided controlling authority that shows why the principles that animate Tennessee's generally strict construction of releases – or contract terms in general – should not similarly extend to covenants not to sue.

At its heart, the issue likely should turn, at least in part, on the appropriate construction of the specific language of a covenant not to sue and the context in which it was made. Here, the Consent Agreement is undeniably broad: it purports to release DuBois and Lovelace "from any and all claims in connection with your participation in the workshop, including without limitation, . . . copyright claims, . . or any other claims or causes of action related to or arising out of the foregoing." Those terms could, arguably, apply to future copyright claims premised on the song that Connor performed at the workshop. On the other hand, the agreement does not expressly state that Connor is releasing future claims, a term that easily could have been made explicit. Indeed, it would surprise the court if both Connor and the organizers of the program (or the instructors) mutually believed that every songwriter who participated in the workshop was

10

essentially giving the instructors free rein to exploit the songwriters' works for profit without limitation and without recourse.[8] Furthermore, although not addressed by the parties, the court is concerned that (in the context of this case) construing the covenant not to sue that broadly would essentially abrogate the protections afforded by the Copyright Act, potentially in violation of the strong federal policy favoring the protection of copyrights. Finally, it is not self-evident to the court whether a copyright claim premised on conduct that occurs *after* the workshop (copying the work, communicating it to other parties, profiting from it, etc.) is a claim that "relates to" or "arises out of" the Workshop itself. Even leaving aside the possibility that parol evidence may be warranted, these are issues of contractual interpretation that merit more exhaustive treatment and consideration than the parties have yet given them.

The court is therefore faced with the following circumstances: (1) a contract whose entire validity Connor intends to challenge; (2) contractual terms that, even taken at face value, warrant further treatment as a traditional matter of contract interpretation; (3) contractual terms that are broad but arguably ambiguous, for which parol evidence may be admissible to interpret their meaning;[9] and (4) an apparent issue of first impression under Tennessee law concerning the construction of "general" covenants not to sue, with a public policy concern lurking in the background.

---

[8] On the other hand, it may be that the instructors would not have wanted to instruct at the Workshop without the assurance that the participants would not sue them for copyright infringement to the extent that any future songs they produced happened to sound, at least in part, like one of the songs presented at the Workshop.

[9] The court makes no explicit finding as to whether the terms are ambiguous or, in the same vein, whether they are sufficiently broad to encompass future claims. Therefore, the court makes no finding that it will necessarily consider parol evidence when construing the contract, although the court will permit the parties to conduct discovery relating to parol evidence.

11

With respect to the Rule 12(b)(6) motion at issue, the court's role is to determine whether DuBois and Lovelace have stated a plausible claim for breach of contract under the terms of the Consent Agreement. In the absence of any controlling Tennessee authority to the contrary, the defendants have met that limited burden. By the same token, given the issues noted in the previous paragraph, the court need not wade into a doctrinal thicket at this stage. Therefore, the court will permit DuBois' and Lovelace's breach of contract claims to proceed, but the court makes no findings concerning the appropriate construction or enforceability of the Consent Agreement as it relates to Connor's claims, except as discussed in the following section.[10]

### B. Fee-Shifting

Connor argues that, even assuming *arguendo* that the covenant not to sue is valid and enforceable, Lovelace and DuBois are not entitled to pursue attorney's fees under the Consent Agreement. "[I]n the context of contract interpretation, Tennessee allows an exception to the American rule only when a contract specifically or expressly provides for the recovery of attorney fees." *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303 (Tenn. 2009) (emphasis added). Thus, even a contractual provision that "[a]ll costs and expenses of any suit or proceeding shall be assessed against the defaulting party" is insufficient to authorize contractual fee-shifting. *Id.*

Although some early Tennessee cases may have suggested otherwise, in *Cracker Barrel*, the Tennessee Supreme Court strongly reaffirmed the application of the "American Rule" in Tennessee, absent unambiguous contractual representations to the contrary. In *Cracker Barrel*,

---

[10] Because the court need not reach the issue at this stage, the court expresses no opinion concerning Connor's alternative argument that a covenant not to sue for copyright infringement is "the same thing" as a copyright license.

the court held that, "[i]f a contract does not *specifically or expressly* provide for attorney fees, the recovery of fees is not authorized." *Id.* (emphasis added). Similarly, in *Holcomb*, the Tennessee Court of Appeals relied upon the same principle, stating as follows:

> [A]ttorneys' fees will not be recoverable in a suit between the parties to a contract to simply enforce the provisions of the contract, unless the language of the contrary expressly allows for attorneys' fees to be recoverable. Tennessee follows the "American rule" with regard to attorneys' fees, and will not allow such fees to be shifted unless there is an express provision in a contract, statute, or some other equitable ground. The lease in this case does not explicitly provide for the recovery of attorneys' fees in enforcing its provisions, and we find no basis to award attorneys' fees.

277 S.W.3d at 397-98 (internal citations omitted).[11]

Here, the Consent Agreement does not specifically and expressly provide for the recovery of attorney's fees for enforcing its provisions. Indeed, it does not even reference the "costs and expenses" that the Tennessee Supreme Court found to be insufficient to authorize contractual fee-shifting in *Cracker Barrel*. Therefore, the court finds that, even assuming that it is valid and enforceable and that DuBois and Lovelace will succeed on their counterclaims, the Consent Agreement does not contractually authorize DuBois or Lovelace to recover their attorney's fees and expenses. Therefore, the court finds that, although the breach of contract counterclaims may proceed, the demand for contractual attorney's fees and expenses will be dismissed.[12]

---

[11] The defendants' reliance on *Aho v. Cleveland-Cliffs, Inc.*, 219 F. App'x 419, 424 (6th Cir. 2007), merits little discussion. The case involved the application of Ohio law in an unpublished federal case. Therefore, it sheds no light on Tennessee law relating to the construction of contracts.

[12] The court notes that the defendants also demand the recovery of their attorney's fees under the Copyright Act, 17 U.S.C. § 505, and 15 U.S.C. § 1117, which provide alternative statutory (*i.e.*, non-contractual) grounds for the recovery of attorney's fees to a prevailing party, under appropriate circumstances.

### C. Consequential Damages Allegedly Suffered by Lovelace

Under Tennessee law, a non-breaching party may recover for categories of damages that were "within the reasonable contemplation of both parties, at the time the contract was made." *Turner v. Benson*, 672 S.W.2d 752, 755 (Tenn. 1984). Connor argues that Lovelace may not recover alleged consequential damages because (1) Lovelace did not explicitly plead that the injuries were reasonably foreseeable or (2) as a matter of law, Lovelace's allegations do not support a plausible inference that the injuries he claims to have suffered were within the reasonable contemplation of the parties to the Consent Agreement.

Lovelace has pleaded that Connor's filing of this lawsuit resulted in a "hold" being placed on all of Lovelace's publishing royalties, thereby causing him financial injury. Lovelace also claims that the lawsuit has prevented him from negotiating a new publishing agreement or selling the portion of his musical catalog that he owns, leaving him without a publisher to promote and exploit his new material. These allegations are sufficient to place Connor on notice of the categories of damages that Lovelace claims to have suffered from Connor's alleged breach of the covenant not to sue. At this stage, it would be inappropriate for the court to rule, based on the pleadings, as to whether these damages were reasonably foreseeable in whole or in part.[13] In sum, whether Lovelace can establish the requisite foreseeability is an issue that the parties may revisit following discovery, when the court will have a factual record on which to base a ruling.

### III. Affirmative Defenses

---

[13] Connor argues with some force that, when she signed the Consent Agreement, she would have had no reason to contemplate that enforcing her copyright to the song Remind Me would, among other things, cause the music industry to "blackball" one of the presenters.

Federal Rule of Civil Procedure 12(f) permits the court to strike, at any time, an "insufficient defense or any redundant, immaterial, impertinent, or scandalous" matter. "[I]t is well-established that the action of striking a pleading should be sparingly used by the courts." *Brown v. Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953). "Thus, 'a motion to strike should be granted only when the pleading to be stri[c]ken has no possible relation to the controversy.'" *Parlak v. United States Immigration & Customs Enforcement*, 2006 WL 3634385, at *1 (6th Cir. 2006). With respect to affirmative defenses, a defendant asserting an affirmative defense is not required to plead specific supporting facts. Instead, "[a]n affirmative defense may be pleaded in general terms and will be held to be sufficient . . . as long as it gives plaintiff fair notice of the nature of the defense." *Lawrence v. Chabot*, 182 F. App'x 442, 456 (6th Cir. 2006) (quoting 5 Wright & Miller, Fed. Prac. & Proc. § 1274).[14]

In her initial brief, Connor argued that (1) all of the defendants' affirmative defenses should be struck because the underlying Consent Agreement did not cover the copyright claims or was otherwise unenforceable in the first place, or (2) even if Lovelace and DuBois could take advantage of the Consent Agreement as intended third-party beneficiaries, the other defendants are not intended third-party beneficiaries of that agreement and, therefore, are not protected by the agreement under any circumstances. The court's ruling concerning the breach of contract claim effectively disposes of Connor's first argument. As to the second argument, the defendants do not offer much in response: they simply state that "a significant question of law

---

[14] Although the Sixth Circuit has not explicitly addressed the issue, there appears to be general agreement among district courts within this circuit that affirmative defenses are subject only to the "fair notice" standard of pleading, rather than the *Twombly/Iqbal* "plausibility standard" for pleading claims. *See, e.g.*, *Bolton v. United States*, 2013 WL 3965427, at *3 (W.D. Tenn. Aug. 1, 2013) (citing *Lawrence*, 182 F. App'x at 456).

15

and fact remains as to what extent the indemnity, release, and covenant not to sue granted to Lovelace and DuBois would affect the Plaintiff's claims against the other defendants." (Docket No. 71 at p. 20.) To prove their affirmative defenses, these other defendants will ultimately need to explain how the Consent Agreement's terms would protect them from Connor's claims, whether or not they are intended third-party beneficiaries. Although their current reference to unidentified "issues of fact and law" will not ultimately suffice, the notion that the Consent Agreement could affect their rights certainly relates to the case, the issue is material, and the defendants have adequately provided notice to Connor of the grounds (the language of the Consent Agreement) for the particular defenses at issue. Striking defenses under Rule 12(f) is an extraordinary action that is not necessary at this early stage in the case.

## **CONCLUSION**

For the reasons stated herein, the plaintiff's motion will be granted in part and denied in part. The counterclaims by DuBois and Lovelace for indemnification will be dismissed. The breach of contract counterclaims by DuBois and Lovelace will proceed, except as to their request for attorney's fees, which the Consent Agreement does not authorize under any circumstances. In all other respects, the motion will be denied.

An appropriate order will enter.

 _____
ALETA A. TRAUGER
United States District Judge